UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NEAL CAPLINGER,<br><br>                    Plaintiff,<br><br>       v.<br><br>CCA, TIM WENGLER, THOMAS KESSLER, ACEL THACKER, DAN LAMBERT, and DR. DAVID AGLER,<br><br>               Defendants. | Case No. 1:12-cv-00537-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Plaintiff, a prisoner in the custody of the Idaho Department of Correction (IDOC) and incarcerated at Idaho Correctional Center (ICC), is represented by counsel in this civil rights matter. Defendants have filed a Motion to Dismiss, arguing that (1) Plaintiff's claims against Defendants Wengler, Kessler, and Thacker must be dismissed for failure to exhaust administrative remedies, and (2) Plaintiff's claims against Defendants Thacker and Lambert must be dismissed for failure to state a claim upon which relief may be granted. (Dkt. 18.) Defendants have also filed a Motion for Summary Judgment. (Dkt. 61.)

Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record and that the decisional process would not be significantly aided by oral argument. Accordingly, the Court will

**MEMORANDUM DECISION AND ORDER - 1**

decide this matter on the record without oral argument. D. Idaho L. R. 7.1. For the reasons that follow, the Court concludes that there is no genuine dispute as to any material fact and that Defendants are entitled to judgment as a matter of law. Therefore, Defendants' Motion for Summary Judgment will be granted, and the Court need not address Defendants' Motion to Dismiss.

## INTRODUCTION

Plaintiff filed the instant action in October 2012. He claims that he has not received adequate prison medical care as required by the Eighth Amendment to the United States Constitution. Plaintiff sues Corrections Corporation of America (CCA), the private prison operating ICC under contract with the IDOC, as well as several CCA employees—Physician's Assistant Dan Lambert, Dr. David Agler, Health Services Administrator Acel Thacker, Assistant Warden Thomas Kessler, and former Warden Tim Wengler.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**1. Factual Background**

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Plaintiff's version of facts, insofar as that version is not contradicted by clear documentary evidence in the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

### A.    *Plaintiff's Injury and Medical Treatment*

In August 2010, Plaintiff fell in the kitchen where he worked at ICC, injuring his right wrist. Defendant Lambert "immediately" evaluated Plaintiff. (Compl., Dkt. 1, at ¶ 14.) Lambert "initially assessed a sprained wrist, splinted it[,] and ordered an x-ray to further define the injury." (Lambert Decl., Dkt. 22-4, at ¶ 3.)

A week after the initial examination, Plaintiff had the x-ray, which showed no fractures or other abnormalities. (*Id*. at ¶ 4.) Lambert informed Plaintiff that the x-ray was normal. Because Plaintiff was still experiencing pain, Lambert evaluated Plaintiff again on November 12, 2010 and ordered a second x-ray; this x-ray also showed "no fracture or other bony abnormality." (Def. Stmt. of Undisp. Facts, Dkt. 22-2, ¶ 6; Pl. Stmt. of Disp. Facts, Dkt. 26-1, ¶ 6.) Because Lambert suspected a ligament injury, he referred Plaintiff to Defendant Dr. Agler "for further evaluation and consideration of a hand surgery consultation." (Agler Decl., Dkt. 22-3, ¶ 10.) P.A. Lambert left his employment with ICC on November 30, 2010, and had no further contact with Plaintiff. (Def. Stmt. Undisp. Facts ¶ 6; Pl. Stmt. Disp. Facts ¶ 6.)

Plaintiff submitted a Health Service Request form on November 29, 2010. He was examined the next day by Bryce Aitkin, a nurse practitioner, who ordered a follow-up with Defendant Agler. (Def. Stmt. Undisp. Facts ¶ 7; Pl. Stmt. Disp. Facts ¶ 7.) Dr. Agler

evaluated Plaintiff's wrist approximately a week later, on December 7, 2010. Plaintiff refused Dr. Agler's suggestion of a cortizone injection, and Dr. Agler "decided to hold off doing an MRI for the time being to see if [Plaintiff's] wrist would improve with time." (*Id.*) Agler ordered a follow-up in one month. (*Id.*)

The follow-up examination was performed by N.P. Aitkin on January 4, 2011. (Def. Stmt. Undisp. Facts ¶ 8; Pl. Stmt. Disp. Facts ¶ 8.) Aitkin noted that Plaintiff's condition had not improved, even though (1) Plaintiff's wrist had been in a splint, (2) he had been taking anti-inflammatory and pain medication, and (3) he had had two normal x-rays. Therefore, Aitkin referred Plaintiff to an offsite orthopedic specialist, and that order was approved on January 10. (*Id.*; Thacker Decl., Dkt. 22-5, ¶ 21.)

According to Defendant Thacker, who is the custodian of Plaintiff's medical records, Plaintiff was scheduled to see an offsite doctor at Mountain States Hand Clinic on February 21, 2011, but that on February 10, the clinic canceled the appointment because February 21 was a holiday. (Thacker Decl. ¶ 21.) Plaintiff takes issue with this statement, contending that Thacker should be disbelieved because the cancellation "has no basis in reason," given that Thacker is "trying to say that the offsite doctor was too stupid to know ahead of time that [the appointment] was scheduled for a holiday." (Pl. Stmt. Disp. Facts, ¶ 9.) Plaintiff contends that, instead, "[e]ither the offsite doctor was never consulted about scheduling the appointment, or the Defendants' scheduler was

lying when they [sic] said they [sic] booked the appointment."[1] (*Id.*)

To the contrary, it is Plaintiff who is engaging in improper speculation here. The Court sees nothing "ridiculous" (*id.*) about a doctor's office booking an appointment and later realizing that the office would be closed on President's Day. Doctors' offices are busy places, and President's Day is not like Independence Day, which falls on the same day every year. Many businesses remain open on President's Day, and the decision to close the clinic that day might have been made after some appointments were already scheduled. The medical records support Thacker's statement that on February 10, 2011, the appointment was cancelled and that the reason given was "president's day[,] need to reschedule." (Ex. A to Thacker Decl., ICC Caplinger 980.) Plaintiff's further objection that Thacker is "only relaying hearsay" is hollow. (Pl. Stmt. Disp. Facts ¶ 9.) The medical records would clearly meet the business records exception to the rule against hearsay, and Thacker, as the custodian of those records, is competent to testify as to their content. *See* Fed. R. Evid. 803(6).

Plaintiff's offsite appointment was rescheduled for March 23, 2011. However, that appointment was also cancelled, for an unknown reason, and rescheduled for April 4, 2011. (Thacker Decl., ¶¶ 22-23.) On that date, Plaintiff was examined offsite by orthopedic hand surgeon Dr. Troy Watkins, who noted that surgery might be indicated but

---

[1] For obvious security reasons, prisoners are not informed ahead of time of the dates of offsite medical appointments. Thus, it appears that Plaintiff was not aware, prior to this lawsuit, that there had been cancelled appointments.

that he would wait to make a final recommendation until Plaintiff had an MRI. (Compl., ¶ 20.) However, Dr. Watkins did not send his report to ICC until May 12, 2011. (Agler Decl. ¶ 22; Def. Stmt. Undisp. Facts ¶ 11; Pl. Stmt. Disp. Facts ¶ 11.) In the meantime, Dr. Agler evaluated Plaintiff on April 13 and re-ordered a prescription for Mobic, as Plaintiff stated that it helped to lessen his pain. (Def. Stmt. Undisp. Facts ¶ 11; Pl. Stmt. Disp. Facts ¶ 11.)

On May 3, 2011, still having not received Dr. Watkins's report, Agler ordered an MRI of Plaintiff's wrist, which was scheduled for June 6, 2011. (*Id.*; Agler Decl. ¶ 24.) Dr. Agler examined Plaintiff again on May 9, 2011, and Plaintiff underwent a second x-ray on June 2, 2011. This third x-ray again showed no abnormalities. (Def. Stmt. Undisp. Facts ¶ 11; Pl. Stmt. Disp. Facts ¶ 11; Agler Decl. ¶ 28.)

The MRI was performed on June 6, 2011, at St. Luke's Regional Medical Center. The MRI revealed that Plaintiff had an avulsion fracture, which had not appeared on the x-rays because "x-rays are not as sensitive as MRIs." (Agler Decl. ¶ 29.) An avulsion fracture occurs when a "ligament is strained to the point that it pulls away a small piece of bone from where it is attached." (*Id.*) In Plaintiff's case, the separation of the ligament caused the space between the scaphoid and lunate bones (two of the small bones in the wrist) to widen. (*Id.*)

The day after the MRI, Dr. Agler ordered a follow-up examination with Dr. Watkins for July 8. However, on the day of the appointment Dr. Watkins cancelled, citing

**MEMORANDUM DECISION AND ORDER - 6**

an emergency. (Def. Stmt. Undisp. Facts ¶ 13; Pl. Stmt. Disp. Facts ¶ 13.) The appointment was rescheduled for August 15. In the meantime, Plaintiff was examined by Aitkin on July 29, 2011 and given a wrist brace. (*Id*.)

Plaintiff was seen on August 15 by Dr. Watkins, but Dr. Watkins did not send his report to Dr. Agler until September 19, 2011. (Thacker Decl. ¶ 27.) That report recommended surgery, which Dr. Agler ordered the day he received the report. (*Id*.) According to Plaintiff's medical records, the appointment was scheduled for October 11, but was cancelled on October 7 because of "a conflict with transport."[2] (*Id*.)

The surgery was performed on November 1, 2011. Dr. Watkins performed a right wrist scaphoidectomy and four corner fusion. (Agler Decl. ¶ 36.) In the approximately four months between the date of surgery and Plaintiff's last offsite appointment on February 22, 2012, Plaintiff was examined 16 times either by medical staff at the prison or by offsite providers. (Def. Stmt. Undisp. Facts ¶ 16; Pl. Stmt. Disp. Facts ¶ 16, disputing only whether Plaintiff's medical examinations amounted to "treatment.")

Plaintiff claims that as a result of the allegedly inadequate medical care he received at the prison, his wrist "is now permanently disfigured and its range of motion is

---

[2] Plaintiff's "doubt[]" that such a conflict existed is insufficient to constitute a genuine dispute as to the reason for this cancellation. (Pl. Stmt. Disp. Facts ¶ 14.) His reliance on Chris Penn's deposition testimony that security staff were generally able to accommodate transportation of inmates to offsite medical appointments does not mean that there was no transportation conflict in this particular case on that particular day. Penn also testified that there could be an event implicating overriding security interests that might interfere with an inmate's transport. (Penn Depo., Ex. C to Tribble Decl., Dkt. 28-3, at 23.)

severely limited." (Compl. ¶ 26.) He argues that Defendants Lambert and Agler, as health care providers, knew that he faced a substantial risk of serious harm if he was not quickly seen by an orthopedic specialist yet deliberately disregarded that risk.

### B.   *Defendants Thacker's, Kessler's, and Wengler's Knowledge of Plaintiff's Injury and Medical Care*

During the course of Plaintiff's treatment for his wrist injury, he complained several times that he was not receiving appropriate medical care. These grievances were submitted to prison officials pursuant to the facility's administrative grievance process.[3] Plaintiff's claims against Defendants Thacker, Kessler, and Wengler are based on those individuals' participation in the grievance process—Plaintiff contends that through the grievance process, these Defendants were made aware that Plaintiff was not receiving adequate health care but that they did nothing in response.

Plaintiff filed a grievance on February 28, 2011, in which he complained that he was improperly charged for a visit to the medical department. (Ex. G to Purcell Decl., Dkt. 18-10, ICC Caplinger 303.) Defendant Thacker reviewed the grievance and informed Plaintiff that it did not appear as if he had been charged a fee, but that if Plaintiff submitted an accounting statement showing such a charge, the prison would

---

[3] Plaintiff also submitted grievances about issues other than the medical treatment he received for his wrist. The Court need not address those grievances as they do not relate to the subject matter of this lawsuit. Similarly, the Court discusses only those grievances that were actually reviewed by the Defendants in this action; it does not address any grievances that were returned to Plaintiff by the grievance coordinator without action because those grievances are irrelevant to the issue of whether Defendants acted with deliberate indifference.

**MEMORANDUM DECISION AND ORDER - 8**

refund his money. (*Id.*, ICC Caplinger 298.) Defendant Kessler concurred with Thacker's response. This grievance did not mention any dissatisfaction with the quality of Plaintiff's care.

Plaintiff submitted another grievance on April 19, 2011—two weeks after his initial appointment with Dr. Watkins—stating that Dr. Watkins wanted Plaintiff to have an MRI. Plaintiff asked to be "placed at the top of the list so that the MRI can be done and the surgery to fix my wrist. So the pain can stop. Medical should not take so long to help people!!!" (*Id.*, ICC Caplinger 297.)

Defendant Thacker reviewed Plaintiff's medical chart and responded as follows:

> Denied. Your medical file was reviewed. You experienced your fall in the kitchen on 8/12/2010 and an x-ray was performed. Your wrist was placed in a plaster cast. You were seen on 8/19/2010 in a follow up. The x-ray was negative for a wrist fracture and you indicated that the wrist was feeling better. You were seen in Medical on 11/12/2010 and you stated that you were having pain in your wrist. You were examined and your provider felt that you might have ligament damage, another x-ray was ordered and you were referred to Dr. Agler. He saw you on 12/7/2010 and determined that you might have cartilate damage. He wanted to order an MRI, but wanted to wait for the results of the 2nd x-ray. He offered you a cortisone injection, but you refused. Your [sic] were seen by NP Aitken on 1/4/2011 for your wrist pain and he ordered a consultation with an orthopedic specialist and a wrist splint. You were seen on 3/28/2011 and asked when your orthopedic consult would he. He told you that it was scheduled. You were seen by the orthopedic specialist on 4/4/2011. We have not seen the report from that consult yet. You were seen on 4/13/2011 and we still had not seen the results of the consult. They were ordered again on that date. At this time we are still waiting for those results and

**MEMORANDUM DECISION AND ORDER - 9**

when they are available, we will be able to determine if you are to be scheduled for an MRI and surgery. It does take a long time to schedule patients for off-site specialty appointments.

(*Id.*, ICC Caplinger 293.)

Defendant Kessler reviewed Thacker's response and concurred with the denial of the grievance. (*Id.*, ICC Caplinger 294.) Plaintiff appealed the denial, which was reviewed by Defendant Wengler. Wengler responded, "It is apparent from [Thacker's] answer and your remarks that you are receiving medical care for your issues. Requested relief is denied." (*Id.*)

Plaintiff submitted another grievance on April 30, 2011, stating that the ibuprofen he had been taking for his wrist pain made his stomach bleed. (*Id.*, ICC Caplinger 292.) Plaintiff also complained that he had been charged for the ibuprofen, as well as omeprazole, which was prescribed to counteract the stomach bleeding. Thacker reviewed the grievance, stating that only chronic care medications are exempt from co-pay charges and that "[b]leeding is a common side effect of taking Ibuprofen and is easily reversed by taking Omeprazole. When you were seen on 4/13/2011, the Ibuprofen was discontinued. If you are still having stomach pain, you may submit [a Health Service Request form] and you will not be charged for a follow-up visit." (*Id.*, ICC Caplinger 287.) Defendant Kessler concurred with Thacker's response, and Plaintiff appealed, complaining that he had not been informed that ibuprofen could make his stomach bleed. Defendant Wengler denied the appeal, stating that "[o]ver the counter meds are ones the FDA has rated as

safe for consumer use. Warnings are posted on the container." (*Id.*, ICC Caplinger 288.)

Plaintiff claims the grievances reviewed by Defendants Thacker, Kessler, and Wengler show that these Defendants knew Plaintiff was receiving inadequate medical treatment and that they were therefore deliberately indifferent in failing to intervene.

## 2.     Standard of Law for Summary Judgment

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, there must be no *genuine* dispute as to any *material* fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

**MEMORANDUM DECISION AND ORDER - 11**

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out

facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court may grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). The Court may also grant summary judgment to a non-moving party, on a ground not raised by either party, or sua sponte provided that the parties are given notice and a reasonable opportunity to respond. Fed. R. Civ. P. 56(f).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. Although all reasonable inferences that can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

**3.      Standard of Law for Section 1983 Claims**

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To succeed on a claim under § 1983, a plaintiff must establish a violation of rights protected by the Constitution or created by federal statute proximately caused by the conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Prison officials are generally not liable for damages in their individual capacities

under § 1983 unless they personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). This causal connection "can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207-08 (internal quotation marks, citation, and alterations omitted).

**4.      Standard of Law for Eighth Amendment Claims**

The Eighth Amendment to the United States Constitution protects prisoners against cruel and unusual punishment. To state a claim under the Eighth Amendment, a prisoner must show that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of Defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires a

plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012). The Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Regarding the objective standard for prisoners' medical care claims, the Supreme Court of the United States has explained that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain . . . .

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

As to the subjective standard, a prison official or prison medical provider acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe, Nev.,* 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837).

"If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted). However, "whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that defendant actually knew of a risk of harm).

In the medical context, a conclusion that a defendant acted with deliberate indifference requires that the plaintiff show both "a purposeful act or failure to respond to

a prisoner's pain or possible medical need and . . . harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted).

Non-medical prison personnel are generally entitled to rely on the opinions of medical professionals with respect to the medical treatment of an inmate. However, if "a reasonable person would likely determine [the medical treatment] to be inferior," the fact that an official is not medically trained will not shield that official from liability for deliberate indifference. *Snow*, 681 F.3d at 986; *see also McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (stating that non-medical personnel may rely on medical opinions of health care professionals unless "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner") (internal quotation marks omitted).

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the

prisoner's health." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alteration

omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Mere indifference, medical malpractice, or negligence will not support a cause of

action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th

Cir. 1980) (per curiam). A delay in treatment does not constitute a violation of the Eighth

Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1060. If

medical personnel have been "consistently responsive to [the inmate's] medical needs,"

and there has been no showing that the medical personnel had "subjective knowledge and

conscious disregard of a substantial risk of serious injury," summary judgment is

appropriate. *Toguchi*, 391 F.3d at 1061.

4.      **Analysis**

In support of their Motion for Summary Judgment, Defendants have introduced

sufficient evidence that Defendants did not act with deliberate indifference to Plaintiff's

wrist injury. The burden thus shifts to Plaintiff to show that a genuine dispute of material

fact exists as to the Defendants' subjective state of mind during the course of Plaintiff's

medical treatment. Plaintiff has failed to do so.

A.      ***Defendant Lambert***

Plaintiff's allegations against Lambert are that he treated Plaintiff's wrist injury

after the initial fall by splinting it, that he told Plaintiff the x-rays of his wrist showed no

abnormalities, and that he prescribed ibuprofen and ice packs. (Compl. at ¶ 14-15.) When

Plaintiff was injured, Lambert initially suspected a sprain. (Lambert Decl. ¶ 3.) Several months later, when Plaintiff showed little improvement, Lambert ordered more x-rays, which were again negative. (*Id*. at ¶ 5.) Lambert then suspected that Plaintiff had injured a ligament and referred him to Dr. Agler. (*Id*. at ¶ 6.) Lambert left his employment at ICC shortly thereafter.

That Plaintiff's wrist later turned out to be broken does not suggest that Lambert subjectively drew any inference that Plaintiff was subject to a substantial risk of serious harm. The two x-rays ordered by Lambert did not reveal the avulsion fracture that Plaintiff had suffered. Lambert examined Plaintiff, ordered tests, referred Plaintiff to Dr. Agler, and gave him medication and ice packs. Plaintiff has not shown that Lambert's decision to treat an apparent sprain with a splint, medication, and ice "was medically unacceptable under the circumstances" or made "in conscious disregard of an excessive risk" to Plaintiff's serious medical needs. *Toguchi*, 391 F.3d at 1058 (internal quotation marks omitted). Therefore, Plaintiff has not rebutted Defendants' evidence that Lambert did not deliberately disregard a substantial risk to Plaintiff's health.

### B.    *Defendant Agler*

Defendants have also presented evidence that Defendant Agler did not disregard a substantial risk of serious harm to Plaintiff throughout the course of Plaintiff's treatment for his wrist injury. Dr. Agler first examined Plaintiff on December 7, 2010. Agler switched Plaintiff's pain medication to Mobic and offered to perform a cortizone

injection, which Plaintiff refused. It is undisputed that Dr. Agler considered ordering an

MRI at that appointment, but "decided to hold off . . . for the time being *to see if*

*[Plaintiff's] wrist would improve with time*." (Def. Stmt. Undisp. Facts ¶ 7; Pl. Stmt.

Disp. Facts ¶ 7) (emphasis added). Plaintiff has not rebutted this evidence that Agler's

initial decision to treat Plaintiff's wrist conservatively was not the result of deliberate

indifference. The evidence shows that Agler did not draw any inference that not

immediately obtaining the MRI presented a substantial risk of serious harm.

Agler ordered a follow-up appointment in one month, which took place when

Plaintiff was evaluated by Aitken on January 4, 2011. Aitken noted that the pain and anti-

inflammatory medication had not resulted in improvement and determined that Plaintiff

should be seen by an orthopedic specialist. Defendants have shown that the offsite

appointment with Dr. Watkins was scheduled for February 21, 2011, but that the

appointment had to be cancelled. Plaintiff does not genuinely dispute that this

cancellation was outside the control of Dr. Agler.

Once Dr. Watkins saw Plaintiff on April 4, 2011, he decided that an MRI would be

helpful. However, Dr. Watkins did not send that recommendation to ICC until over a

month later. Meanwhile, Dr. Agler had examined Plaintiff and decided independently to

order an MRI, which was later performed. There is no evidence that the delay between

Dr. Agler's decision to order the MRI on May 3, and the actual test on June 6, was

attributable in any way to Dr. Agler. (*See* Def. Stmt. Undisp. Facts ¶ 11; Pl. Stmt. Disp.

Facts ¶ 11.)

The day after the MRI, Dr. Agler ordered another follow-up with Dr. Watkins. That appointment, initially scheduled for July 8, had to be cancelled and was rescheduled for August 15. There is no evidence that Dr. Agler was responsible for the cancellation. Indeed, Plaintiff acknowledges that the Dr. Watkins cancelled the appointment because of an emergency. (Def. Stmt. Undisp. Facts ¶ 13; Pl. Stmt. Disp. Facts ¶ 13.)

Although Dr. Watkins recommended surgery after his examination of Plaintiff on August 15, 2011, he did not send ICC that recommendation until September 19, 2011. (Agler Decl. ¶ 34.) Agler acted immediately and ordered the surgery. Though the initial surgery appointment, scheduled for October 11, was cancelled and the surgery had to be rescheduled for November 1, there is again nothing in the record to indicate that Dr. Agler was responsible for the cancellation. The surgery was later performed as scheduled on November 1, 2011.

As can be seen from this chronology of events, Dr. Agler was reasonably monitoring Plaintiff's wrist injury and did what he could to get Plaintiff to an orthopedic specialist as soon as reasonably feasible. Plaintiff has not shown that the initial treatment of the injury as a sprain was medically unacceptable or was the result of a conscious disregard of an excessive risk. *Toguchi*, 391 F.3d at 1058. Even if some of the delay in Plaintiff's treatment suggests negligence, Plaintiff has not brought forward sufficient evidence that Dr. Agler consciously disregarded a substantial risk to Plaintiff's health.

## C.     Defendants Thacker, Kessler, and Wengler

Plaintiff also claims that Defendants Thacker, Wengler, and Kessler—who all participated in the grievance process with respect to Plaintiff's complaints about his medical treatment—were deliberately indifferent because they knew he was not receiving adequate care and yet did nothing to help him. However, the record does not support Plaintiff's allegations.

These three defendants did not participate in Plaintiff's medical treatment. They are not doctors or nurses and are not otherwise medically trained.[4] As such, they were entitled to rely on the medical opinions of Lambert and Agler so long as a reasonable person would not have determined that their treatment of Plaintiff was inferior. *See Snow*, 681 F.3d at 986. Plaintiff has failed to overcome Defendants' evidence that, to a reasonable person who is not medically trained, it would have appeared that Plaintiff was receiving appropriate treatment for his injured wrist.

## D.     Defendant CCA

To succeed on his claims against CCA as an entity, Plaintiff must meet the test articulated in *Monell v. Department of Social Services*, 436 U.S. 658, 690-94 (1978); *see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities). Under *Monell*, the requisite elements of a § 1983 claim against a

---

[4] Defendant Thacker has been trained in microbiology, medical technology, and hospital administration, but he has not been trained to diagnose or to treat patients. (*See* Thacker Depo. Ex. B to Tribble Decl., at 11-12.)

municipality or private entity performing a state function are the following: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Further, a municipality or private entity performing a state function "may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010).

Defendants have offered sufficient evidence that CCA does not have an official or unofficial policy of delaying or denying adequate medical care that amounts to deliberate indifference. As the medical records reveal, in the approximately 15 months between

Plaintiff's injury and his surgery, he was evaluated by medical personnel at least 17 times. (Def. Stmt. Undisp. Facts ¶ 15; Pl. Stmt. Disp. Facts ¶ 15.) This number of appointments and the time periods between them are not significantly different than those a free citizen with health insurance would experience when faced with a similar injury. Throughout that 15-month period, Plaintiff was prescribed medication for pain and inflammation. All of the x-rays Plaintiff was given showed no abnormality, and it was not until the MRI was performed on June 6, 2011, that the avulsion fracture was discovered. Thus, it cannot be said that CCA has a custom of denying adequate medical care.

Plaintiff claims that CCA has an unofficial policy of delaying offsite appointments. However, as the record shows, each time prison medical personnel ordered an offsite evaluation, the appointment was *made* within a matter of days. Although Plaintiff's appointments were *scheduled* for much later, Plaintiff has not shown that these delays were attributable to CCA policy. Doctors' offices often do not have open appointments for several weeks out. Similarly, that some of Plaintiff's appointments had to be cancelled does not mean that they were cancelled as a result of a custom or policy on the part of CCA. Indeed, the records indicate that there were discrete reasons for each cancellation, only one of which was cancelled for an unknown reason. This single incident of a potentially unjustified cancellation is insufficient to establish a custom or policy amounting to deliberate indifference.

Plaintiff has submitted an uncertified "rough draft" transcript of a deposition of

Dr. Watkins, conducted by Plaintiff's counsel in a different case, as evidence that "[i]f patient availability is not a problem, Dr. Watkins usually can schedule and perform a surgery within a week or two of when surgery is ordered." (Tribble Decl. ¶ 7 & Ex. M; Dkt. 26-2 at ¶ 19.) However, Dr. Watkins's statement about the general nature of his practice says nothing about what happened in this particular case when CCA employees scheduled Plaintiff's offsite appointments. Indeed, Dr. Watkins twice delayed sending his own report to ICC medical providers and had to cancel some of Plaintiff's appointments, which certainly played a part in pushing back Plaintiff's surgery. Here, the record shows that, while there were delays and cancellations, the medical treatment Defendants provided to Plaintiff did not constitute cruel and unusual punishment in violation of the Eighth Amendment.

Even if, in hindsight, it is clear that Plaintiff should have been sent to an orthopedic surgeon sooner, and even if his surgery should have been performed sooner once it was ordered, Plaintiff has not come forward with sufficient evidence that CCA's customs constitute deliberate indifference or that they caused a deprivation of Plaintiff's constitutional rights. Although it appears to the Court that the system CCA has put in place to treat inmates' serious medical needs is not an ideal way to deliver health care in a perfect world, this is not a negligence or medical malpractice case. Not every mistake in correctional medical care constitutes an Eighth Amendment violation. Plaintiff has simply not overcome Defendants' evidence that Plaintiff's medical treatment satisfied

constitutional standards.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted and the case dismissed with prejudice.

## ORDER

**IT IS ORDERED:**

1.  Defendants' Motion for Summary Judgment (Dkt. 22) is GRANTED. This case is DISMISSED with prejudice.

2.  Defendants' Motion to Dismiss (Dkt. 18) is DENIED as MOOT.

DATED: **February 11, 2014**



Honorable B. Lynn Winmill
Chief U. S. District Judge